Good morning, Your Honors. May it please the Court, I am Randall Smith of Brown Rudnick, on behalf of the plaintiff and appellant Robert Moiser, who is the receiver for PEM Group and affiliated entities. Defendant and appellee Stonefield Josephson is an accounting firm that provided a variety of accounting and business services for PEM Group and its affiliated entities, including a series of those entities that went by the acronym of GVEC, G-V-E-C, but in this argument I'll refer to them collectively as GVEC. And those entities and other affiliates of PEM Group were used by PEM Group to raise hundreds of millions of dollars from investors for the purpose, supposedly, of investing in life insurance policies. It was a Ponzi scheme, we know that. Correct. PEM Group served as the auditor and accountant for these entities from 2003 until 2009 when the Wall Street Journal published an expose of the illicit operations relating to PEM Group and thereafter the SEC intervened and Mr. Moiser was appointed as receiver. Mr. Moiser then brought this action against Stonefield, asserting three distinct claims based on the services that Stonefield had provided to these entities. Mr. Moiser brought a claim for professional negligence, he brought a separate and distinct claim for aiding and abetting conversion, and a separate and distinct claim for unjust enrichment. As your honors are aware, the district court granted a summary judgment disposing of all of those claims and on this appeal the standard of review on that ruling is a de novo standard of review. I intend to briefly discuss the claims in that order, that is the negligence claim first, the aiding and abetting claim, and finally the unjust enrichment claim. Try to speak directly into the microphone, because everything we say here today is recorded and we're on television as you speak. Fair enough, I will try to do that, your honor. All right. Now the district court's ruling on the professional negligence claim ultimately was based on a finding by the district court that the receiver had to prove reliance on the Stonefield audits in order to prove... Reliance by whom? Well, the district court alternatively discussed reliance by management and investor reliance. Investors, right. And I intend to... Now management was all crooks, so, I mean, but what about the investor reliance? Moser said that he'd been at meetings with these investors and they had told him that they had relied, but that was stricken as hearsay, am I right? You are absolutely right. Well, then where are the witnesses who said we relied? There were none that were presented in any form whatsoever. That strikes me as difficult to believe. Your honor, we did not present a declaration from any investor. Why not? I mean, that would cement your case. You knew you were looking at a failure of reasonable reliance. If you had some kind of a declaration that said, hello, I'm an investor and I relied on all this stuff, then you'd have been over that hurdle. But I don't understand why no investors were presented. Well, your honor, we felt that the evidence, the other evidence that we did present to the district court was sufficient. Well, you felt, but you were wrong. And, I mean, if you had, where are these investors who relied? That struck me as difficult to understand. Part of the problem with that is, your honor, they're all in Taiwan. Couldn't you get affidavits or declarations or some sort at least to get past the motion that you were confronted with? We did not, admittedly did not do that, your honor. Why not? I mean, that strikes me as amazing. Because we felt the evidence that we had was sufficient to get by the summary judge. And you were wrong. Well, if I could explain. And that's why we're here, because you didn't take the simple step. You tell us, Moser tells us that he talked to investors. Investors say, we relied. Then when we come to court, it's stricken as hearsay and you don't attack that. That's clearly a correct ruling. And so there's this void in the case that's large enough to drive a truck through that I still don't understand it. Well, if I could, your honor, let me briefly address some of the evidence that was not. Is that the only reason you felt that it wasn't necessary? In other words, you could have gotten them and you just didn't bother? We made the decision, your honor, that the evidence we had was sufficient to defeat the summary judge. Not a very good decision, was it? In hindsight, in light of the ruling as it presently stands, I would tend to agree with your honor. But if I could, I think that given the opportunity. I mean, I've never seen a lawyer who had witnesses at his or her disposal who would prove a pretty important element in a case who says, well, I just felt I didn't need to call him. Well, the witnesses were not at our disposal, but we did have evidence which was. And if I could briefly cover some of the high points. I know. I've read all the circumstantial evidence three or four times. And while the circumstantial evidence, your honor, shows clearly from Stonefield's own documents, internal e-mails, that Stonefield was well aware of the fact that these audits were being used for the investors to facilitate the fundraising. There are even e-mails that say we need them now. If you don't have it, you're going to compromise our fundraising efforts. That still doesn't show reliance by anybody. Well, your honor, under the Cornwell Electoral Central Union case, the circumstantial evidence is entitled to the same weight as direct evidence. And I would submit that that circumstantial evidence is substantial and shows that, in fact, these reports were used to facilitate the fundraising from the investors. So this is the evidence that you're going to go to trial on. You're going to lose. Well, that was not the only evidence, your honor. We also had the declaration and the expert report. The expert report's not very convincing as far as I'm concerned. I mean, what does the expert say? Well, your honor, the expert opined that, in fact, that these audits were important for the fundraising efforts. He doesn't say they were relied on. He says these are the kinds of things that people tend to rely on. You're correct. He has not opined that they were, in fact, relied on. And so we still don't know that they were. I mean, I hate to sound like I'm hectoring you, but I'm just amazed at the absence of direct evidence in this case when your side says there was direct evidence. Again, your honor, I would go back to the Stonefield internal documents out of their own files which show that these things were used for the fundraising. At what stage was this hearsay stricken? At the summary judgment stage, your honor. Well, at what stage? So you knew that you just lost your evidence of investor reliance? At the hearing on the summary judgment is where that ruling was made, correct. And did you ask for any leave to present additional evidence? Not on that point. No, there was. Why? You see, this is an appellate court. You know, we sit in judgment of what happened down below. It's not a time to redo a case. Well, and I'm not suggesting that it is the time to redo the case. However, I don't think there were new facts or circumstances that would give us an opening to ask the court to reconsider. The court made its ruling, whatever it was. And we had submitted and taken our best shot with the evidence that we presented. I mean, a first-year law, I'm not criticizing anybody, except a first-year law student might recognize that that testimony was flat out, dead bang, as we used to say in the streets, hearsay. I don't see how anybody could have reasonably expected a court to accept hearsay evidence on an issue as important as this. Well, Your Honor, I agree with you that the Mosier testimony was flat out hearsay. Right. We also have the testimony, the deposition testimony of Mr. Kwan, which is, at worst, for the receiver, ambiguous in terms of whether or not it's hearsay. And our position is, and we lay this out in the papers, Mr. Kwan testified that, in fact, these audit reports were sent to the fundraising office in Taiwan. What happened when they got to the office? Well, they were used for fundraising purposes. Who says that? We don't have that testimony, Your Honor. We have the testimony that these were obtained and immediately sent to the fundraising office in Taiwan. It seems to me it's a logical inference. The reason you're sending them to your fundraising office is to facilitate your fundraising. Then you get into what's an inference and what's a guess, and what's sufficient evidence to sustain a verdict in your favor. I'll correct, Your Honor, but we submit that at the summary judgment stage, that in light of the fact that circumstantial evidence is entitled to the same weight as direct, and in light of what we put in, that what really happened here is the court conducted a trial on paper, thought the evidence that Stonefield presented was better, but that wasn't the standard we had to meet. We had to raise a tribal issue. You know, 26 years ago, Sandra Day O'Connor came to a Ninth Circuit Judicial Conference in Alaska after the summary judgment trilogy came down, Mashoushita, Liberty Lobby, and all the rest, and she was asked directly, what's this all about? And she said, trial judges are supposed to look at the evidence and see whether, if that's the evidence that's submitted, and the jury should find a verdict based on that evidence, whether it would be sufficient. And if it isn't, get rid of it right now. And it seems to me that it's appropriate to do that. Court takes a look at the evidence and says, that's not enough to sustain a verdict in your favor, and so summary judgment will be granted because we're not going to waste time with a trial. Because you have to come forward with all your evidence. We're not going to waste time with a trial when I'm simply going to can it if a jury should happen to come back with a verdict in your favor. And so I think people went home from that conference saying, okay, that's what we're supposed to do. And if you can't fill all the pigeonholes, the case is gone. So it isn't really trying the case. It's determining whether if the case is tried based on this, it's sufficient to support a verdict in your favor. And on that point, Your Honor, I would submit the evidence was and is, and for that reason would ask that this Court reverse that ruling. But if I might, my time is running short. If I could briefly cover the aiding and abetting ruling. I'd really like you to touch on the unjust enrichment because it doesn't seem to me that that was really dealt with in the trial court at all. It wasn't, Your Honor. And on the unjust enrichment, it's a bit of a, I think, unfair position for it to place the receiver in. But here we are. But that really wasn't even briefed at the trial court level. And quite frankly, we were somewhat surprised, to say the least, when the ruling came down also dismissing that claim. It wasn't teed up. It was a plenary summary judgment motion, though, attacking your entire case, wasn't it? And summary adjudication. But, yes, they did ask for a complete, yes, they asked for a complete summary judgment. So what evidence did you submit supporting the possibility of an unjust enrichment? We submitted the declaration of Mr. Collins indicating the amount of the fees which had been paid both by PEM Group, the lion's share of the fees, and smaller amounts by GVAC to Stonefield for the deficient services they provided to these entities over the period 2003. And so how is that unjust enrichment? Well, they received a benefit, Your Honor, from these companies that are part of the estate for performing deficient services. It seems to me in that circumstance. Is this a claim for restitution? Is that what it boils down to? It wasn't styled that way, Your Honor, but effectively I think I would agree that's the nature of what the claim ultimately is, yes. It was a contractual matter, wasn't it? You agreed to pay them fees for their professional services. There were engagement agreements, and we did agree to pay fees, and the fees were paid, yes, indeed. Is there a release, though, however, that's floating around in this case that might stand in your way? I don't think there is on the disgorgement of fee requests, Your Honor, no. And did not the accounting firm give you a few heads up about some of the procedures? Well, part of the briefing before the trial court certainly had to do with the qualified nature of the audit opinions. We submitted the declaration to Mr. Preber, a managing partner from Grant Thornton, explaining that, in fact, in this circumstance where you're qualifying 80 percent or more of the company's assets, that was improper, and, in fact, they shouldn't have issued any audit opinions at all. They weren't playing funny stuff with the numbers or cooking the books for you. They were telling you that some of the stuff that I'm talking about, Mosier's predecessors and interests, they told them, you know, you guys aren't quite doing it right. Isn't that right? They did qualify the audit opinions to a great extent. To a great extent. So how could that be unjust in Richmond? I mean, they didn't give you, you know, five gold stars and say this is the greatest operation that ever existed. Well, they didn't, Your Honor. They kept saying, you know, time out, there's something wrong here. Well, that's the problem, they didn't, because if they had done that, they would have resigned as auditors. They didn't do that. They continued to essentially say we're happy to earn the fees and issue qualified opinions that we should not be issuing under the accounting standards because we want to earn these fees. And Mr. Preber's declaration laid that out. And doesn't that come full circle then about the issue that Judge Trott's been raising with you about if management was taking this professional advice given by accountants and not really advising the investors that, you know, we're not handling this properly, then does that not bite you on your main two claims on the summary judgment? Well, certainly if we were trying to prove causation based on management reliance, I would agree with you, Your Honor. There was no independent, legitimate member of management. I would agree with that. But on the investor reliance side, I would not agree. Mr. Smith, did you try this case? Well, I argued the summary judgment, yes, Your Honor. It was not tried. It was disclosed entirely by summary judgment. Yes, sir. Thank you. If I could briefly, Your Honors, touch on the aiding and abetting claim. I think this is significant because the trial court clearly applied an incorrect legal standard here, essentially conflating the aiding and abetting claim with a negligence claim and finding that because the negligence claim failed, we couldn't maintain an aiding and abetting claim. But reliance on the audits was not a necessary element of the aiding and abetting. And all we had to show was knowledge and substantial assistance. And I would submit to Your Honors, if you look through the evidence cited in our brief, there is overwhelming evidence that Stonefield knew before they even took the engagement that these people were crooks, continued to earn the fees, and signed off on audit reports, agreed-upon procedure reports, for these improper intertranche transfers where new monies were taken and used to pay off the old failing funds. Stonefield actually reviewed them, signed off on them, and approved them, even calculating the amounts of overpayments beyond the value of the policies that were being sold. You're saying they'd have to put Ponzi in 16-point type on their report. There's even an e-mail in May of 2008 that concludes that the insurance is a fraud and that appears to be why they're using funds to pay off older funds. It was a classic Ponzi scheme, and Stonefield at some point knew that, or at least knew enough information on an aiding and abetting theory that they are liable for the conversion of those funds. So aiding and abetting what, by omission? No, no, by providing comfort letters to investors, which we presented with our opposing papers, by signing off on the reports that closed out these intertranche transfers. The comfort letters were addressed to whom? To whom it may concern. But this was not aiding and abetting by omission. They were actively involved in facilitating these intertranche transfers. And based on that fact, Your Honor, we submit it was improper for the district court to essentially say, same as negligence, it's on the audits and you're out of here. And, in fact, this is all obviously brief and I'm over my time. Your time is up. We'll give you a few minutes for rebuttal. Fair enough. All right. Okay. Thank you, Your Honors. Good morning, Your Honors. My name is Steve Tully. I represent the defendant and appellee, Stonefield Josephson. You have to speak right into that microphone. I'd like to pick up on a few points that have been raised. You know, it might be helpful if you would go directly to the aiding and abetting point while it's fresh in our minds. Sure. Counsel says that the court used the wrong standard with respect to aiding and abetting. Reliance isn't involved. What's your answer to that? Several responses, Your Honor. Aiding and abetting, or the factor of it, substantial assistance, is governed by the substantial factor test, which is identical to the substantial factor test in negligence. So to say that the court applied a wrong standard is not correct. Additionally, with respect to these other documents, the comfort letters, et cetera, none of that is pleaded in the First Amendment complaint, which is tab 54 in the record. The only thing that is pleaded is the audits. But beyond that, there is absolutely no evidence that any work product of Stonefield Josephson, whether it's the audits, comfort letters, or anything else, was delivered to investors, was actually relied upon by investors, and was justifiably relied upon by investors. So if I give you an ax to chop up somebody, but you don't chop up somebody, you shoot them with a gun, I haven't aided and abetted the homicide. Your Honor, if the ax in this case is the audit, I think that's not a proper analogy, because when you look at what the audit actually said, and Your Honor picked up on this, but if I could just be a little bit more specific, the audit, each audit, disclosed multiple violations of the accounting rules, disclosed that 90% of the assets of GVC were not properly accounted for, and Stonefield Josephson declined to give an opinion on the financial statements as a result of those violations. And here is testimony from Mr. Mosier about the significance of those disclosures on the face of the audit. This is at the record, page 299. Can you name for me a single audited, compiled, or reviewed financial statement that you have ever seen in your life that contained more disclosures of violations of GAAP by the company than Stonefield discloses in Exhibit 55? I answered no. Now here's testimony from an agent of Mr. Mosier's named Wilbur Kwan, who worked for him and was part of his investigative team, and in fact was CFO of GVC and PEM Group. This is at the record, page 342. As a practicing accountant, since your time at Bay Sherman beginning in 1996, have you ever in your life seen more prominent disclosures of violations of GAAP and disclaimers of opinions than you saw in Stonefield's audit reports for the GVC tranches for the years 05, 06, and 07? The deponent, no. So whether it's investors or management, well, I'll go back to a case Judge Trott is familiar with, Smolin. And in that case, along with the Atari case, at page 965, one of the holdings was that where a plaintiff is on notice of potential misstatements in a financial statement, reliance is unjustified as a matter of law. And what these disclosures and warnings and disclaimers communicated to any reader was there is a high potential that these financial statements are misstated and there is a certainty that they are not properly accounted for. And to go to your question, Judge Trott, on aiding and abetting, I would direct the Court's attention to another case out of the Ninth Circuit called Wessel v. Bueller, which I think has a... That's in the briefs? Yes, it is. And in that case, the Court considered a similar aiding and abetting claim as submitted here by the plaintiff and emphatically rejected it. Their investors were never given, never saw, and never relied upon the financial statements that the defendant accountant prepared. That's exactly the same as the evidence here. The claim by the plaintiff in Wessel was that nevertheless, the accountant should have disclosed irregularities and had that occurred, then the fraud of the client corporation would have been prevented. Placed client management in a position to dupe the investors, subjected them to aiding and liability. The Ninth Circuit disagreed. There's not a scrap of authority supporting this extraordinary theory. That's what you're talking about in Wessel. That is exactly what I'm talking about. And I would also point... Well, what the Court also said was that this could expose accountants to limitless vistas of liability and would invite serious mischief insofar as speculation and improper theories are concerned. And here we have, frankly, even a more egregious fact pattern. Because not only were these audits and these other documents never provided to investors, at least there's no evidence admitted that they ever were, and never were relied upon them, but we have these disclaimers that had they ever been provided to a third party, whether it's an investor or anybody else, the message is, according to the cases we've cited in our brief, which includes U.S. v. Arthur Young, United States Supreme Court case, Biley v. Arthur Young, California Supreme Court case, the Podlaski case and the Lindner cases, all of them say, when you have disclosures of this sort, essentially, in the words of one of the Court, buyer beware and reliance is unjustified as a matter of law. Let me go back to Wessel, because the other side then says in its reply brief to your representation with respect to Wessel, that that's a case where stockholders brought a 10b-5 action against the president of a corporation, and the Court found that, and I quote, none of the three financial statements was made in a manner reasonably calculated to influence the investing public. There was no evidence that the items of Pellant's attack were not prepared in accordance with the good accounting practice under the circumstances. And then they say, here in contrast, the receiver presented evidence that Stonefield's audits fell below the standard of case and were misleading. Does that distinguish Wessel? No, it does not, because the critical analogy and similarity here is that the work product of the accountants was never provided to any investors. What the investors were essentially claiming was liability on the part of the accountant by omission, saying you did not communicate to the investors. Sorry, Your Honor. Go ahead, finish your thought to Judge Trott. I didn't mean to interrupt you. That omission is much different than a situation in which there was investor reliance or at least investor receipt. And I do want to talk about the Mendelsohn case, but, Your Honor, because I think the Mendelsohn case is also That's a district court case, isn't it, Mendelsohn? 1979 out of the Northern District. Yeah, that's a district court case. And in that case, similar to Wessel, an outside accountant prepared tax returns, tax projections, and tax opinions. None of them were ever supplied to or relied upon justifiably or actually by any investor. The court granted summary judgment holding that the accountant's services did not constitute substantial assistance and held that setting up the books and financial documents that were not relied upon could not have facilitated the fraud. Was that substantial assistance as a matter of law? I mean, there might be a case where all of a sudden there's enough at least to get by summary judgment, right? Wouldn't that be a fact issue? I don't believe so, Your Honor, because Mendelsohn was a summary judgment case. Well, I'm not saying that it can never happen. It should never happen on summary judgment, but there may be some cases where there's enough evidence on substantial assistance to get past summary judgment to a jury. To the extent that there is what I'll call an interruption in the causal chain as a result of the audit, I would absolutely agree. There is no evidence of that here. Your Honor, and I don't mean to be facetious, but under the evidence that's before this court, it is as if this audit was placed in a drawer never to be used by anyone. There is simply no evidence of any use or reliance. It struck me that there's enough qualifications and warning signals in these audits, so if I were a crook, I'm not sure I'd show them to an investor. Well, I want to make my last point about Mendelsohn because the court raised that. It said not only did the client's work product not facilitate the fraud, but in fact it made exposure more likely. Well, when you have audit reports that communicate that the company is not properly accounting for its assets and in fact won't even disclose the nature of those assets, and the auditor is saying, I'm not going to give an opinion on this, that is anything but substantial assistance. What about unjust enrichment? Unjust enrichment, as Your Honor noted, we made a motion for summary judgment on the entirety of the case. Right. And the plaintiff, if it believed that there actually was a cause of action for unjust enrichment, could have and had the opportunity to... Answer and defend, and they apparently didn't. Well, they did not, but I would also say, Your Honor, we have cited, I believe, for the court, 17 cases, including six out of this court, that have held that unjust enrichment is not a separate cause of action. Well, but it seems that in California law there seems to be cases all over the place on that, and some courts say, well, we're not going to look at the label of unjust enrichment, we're going to allow amendment or construe it as restitution and let it go forward on that ground. Well, but I would... Well, the label shouldn't make any great difference, should it? I think that perhaps an important point, and I think counsel said this during his argument, is that there needs to be an underlying wrong, I think in his words, a deficient audit attached to it. And in this case, because summary judgment was properly granted with respect to the two underlying wrongs alleged, professional negligence and aiding and abetting, then necessarily under, I think, all of the law of California, whether they call it a separate cause of action or not, the underpinning, the necessary foundation for unjust enrichment... Does the receiver get to stand in the shoes of the crooks, or does the receiver get a better position? Well, for our position here, I don't think that it will make a difference because we don't need to impute anything to the receiver. The evidence here shows there is a failure of causation due to the absence of evidence of any, again, interruption in the causal chain as a result of the audit without imputation. There's this tantalizing agreement in every engagement agreement with the GVAC that says because of the importance of management's representations to the effective performance of our services, Genesis Voyer Equity Corporation will release Stonefield Josephine and its personnel from any claims, liabilities, costs, and expenses relating to our services. How does that play into the unjust enrichment possibility or restitution possibility? I think it's an additional ground to eliminate it, and let me just respond to your point, if I may, about whether the... Why don't you speak into the microphone? Sorry. To your point about whether the receiver steps into the shoes, I think in paragraph 34 of the first amended complaint, and 43 as well, the receiver alleges a contract. Right. So, and under California law, lobe versus lobe, a contract is a necessary... Stuck with a contract. Yeah. So the contract here releases as a result of misrepresentations. The receiver admits, and it's undisputed, that there were numerous misrepresentations, and in his words, lies, to Stonefield Josephine. So that triggers that agreement that he's bound by because he's alleged it, and our position is, and always has been, that, yes, it eliminates unjust enrichment, but it also eliminates the other two causes of action as well. Yeah. Okay. Well, it seems to me that you could view this claim as a... Quasi-contract claim for restitution, if you're looking for a label. And I don't disagree with that, and, in fact, I think various courts have, if not verbatim, said that. However, you still need to have an underlying wrong. Well, how could you view it as a quasi-contract when there is a contract? Well, not quasi. I mean, there is a contract. You're right. I think this is a contract. Well, I think the contract here eliminates the claim of restitution, if that's what it is, due to the release language and the fact that the plaintiff has relied upon that contract as a foundation of this case. Okay. Mr. Lynch, back when some of us here were practicing law, it used to be the rubric that you could make money by turning down business. And my question is that your client continued to represent the now defunct company. You attach a lot of weight to the red flags that you say appeared in these audit reports. I take it that your client viewed management as its client. Is that correct? I believe that the client was GVC and its entities. And that would be the officers and directors. Well, it's the entity. Why don't you just speak up a little bit? Sorry. They certainly dealt with the officers and directors. And do I take it then that your client felt, in effect, no fiduciary relationship to the investors? The answer is yes, but yes as a matter of law. Yes what? As a matter of law, because this court... As a matter of law, what? An auditor is not a fiduciary. And that's Franklin v. Tolman, which is out of this court, and I think also U.S. v. Arthur Young, United States Supreme Court. So there was absolutely no fiduciary duty as a matter of law. So what does the receiver do with any money the receiver recovers? Well, the receiver has paid himself millions of dollars. He's paid his investigative team, which he says is about two dozen people, millions of dollars, one of them $1.6 million. He has paid out to investors. One point that I'd like to make in this regard is that, again, the First Amendment complaint, tab 54 in the record, it only alleges the audits and it only alleges deficiencies with respect to the inter-traunch sales. In the record, Your Honor, we have cited the receiver's admission that neither he nor GVC nor any of the receivership entities have any liability for those inter-traunch sales at this point. So there is no damage with respect to the inter-traunch sales that are the subject of this. I guess the theory is that your client continued to accept money even after your client understood that this was a scam, a fraud, a Ponzi scheme, and all the rest of that kind of stuff. And so that money that they were accepting after they knew that there was trouble ought to be returned. And that theory that I've heard is proven false by the plaintiff's own admissions. And if I could take – I know I'm over, but if I could take – That's okay. I'd like your answer. Thanks. Mr. Mosher, in his deposition, the record at page 287 testified there was no fraud until mid-2006. He further testified at page 298 that in the 2004 and 2005 audits, there was no fraud for Stonefield-Josephson to report. And the first time any fraud could have been reported would have been mid-2007. And he went further on page 298 to say, I have no claim. I am not asserting a claim against Stonefield-Josephson. Are you saying that the auditors had no idea that this Ponzi scheme was going on? I'm saying that up until mid-2007, as a consequence of the sworn admissions of this plaintiff, there was no fraud and there was no Ponzi scheme. That's his testimony. When did the first red flags go up? He said the first red flags went up in mid-2007. And when did they appear in print on your client's audit reports? They did not. But if I could finish my point on this. Well, I'd like to know why they didn't. I'm bothered by this case. I mean, it seems like the crooks, you know, they got punished in other ways. But the CPAs and the auditors are supposed to keep an eye on this. They have no duty to investors. They had to know what's going on. The auditors had to know what's going on? No. They're looking at the books all the time, aren't they? Your Honor, the testimony here from Mr. Mosher is absolutely clear that GVC and management lied to intentionally misrepresented and concealed facts from Stonefield-Josephson. So, no, they did not know. And, in fact, the receiver here admits they did not know. Until mid-2007? Well, not even in year 2007. Again, there's no evidence that Stonefield-Josephson was aware of a fraud in 2007. My point that I was trying to make is if you look at these documents that they're talking about where the Stonefield-Josephson is questioning GVC and its practices, those go to the years, and this is in their reply at page 20, January 31, 2005, March 31, 2004. And they relate to March, excuse me, the 2003 and 2004 audits. That's in the record at pages 802 and 815. Well, the claim that Stonefield-Josephson was aware of a fraud based on these documents cannot possibly be true because they relate to the 2003 and 2004 and 2005 audits when the receiver has admitted there was no fraud. So, I'm sorry. Go ahead. To go to, I think, the point that Judge Trott was raising, and Judge Pregerson as well, in order to have unjust enrichment, there needs to be an underlying wrong. And the underlying wrongs alleged here were negligence and aiding and abetting, both of which we believe the district court correctly determined were absent of causation supported by this court's ruling. Well, we're looking at an equitable remedy when we're talking about restitution. Well, unjust enrichment must attach to an underlying wrong. So, I would submit one cannot do equity without an actionable underlying wrong. And here, if your honors were to agree with the district court and our position that there's been an utter failure of proof of causation with respect to aiding and abetting and with respect to negligence, and further, that any claim of unjust enrichment and any claim at all is precluded by the releases in the contracts which the plaintiff pleads and alleges here, well, then in that case, under the law, there is no underlying basis, or I would submit equitable basis, for unjust enrichment, particularly when we attach to this release the plaintiff's admissions that are in the record that the GVC lied, they intentionally misrepresented and concealed information from Stonefield, that's pages 239 and 240. And if I could just take a minute to read one other admission of the plaintiff that I think may go to this point of equity. This is at page 304. And again, based on your investigation and that of the people who work for you, is it correct that GVC and its management were aware at the moment they received the Stonefield audit reports for December 31, 2006 and December 31, 2007 of GVC and its tranches that those audit reports and financial statements did not disclose the true facts concerning the financial condition and alleged fraud by GVC and its tranches? It will appear so. So there is really no dispute here that Stonefield was the victim of fraud, of lies, intentional misrepresentations, and intentional concealments. So I would submit under those circumstances there is no equitable basis for unjust enrichment or otherwise. When was the last time that Stonefield, Josephson, had a professional relationship with Mosier's predecessors in title? I mean, just when was the last statement that was paid to your client? The last statement was 2007. 2007? That's when they terminated their? Well, that was the last audit, December 31, 2007. To be candid with you, Your Honor, I don't recall when the relationship ended. Okay. And how did the relationship end? When it went belly up or? If I recall correctly, and I'm not even sure this is in the record, but that audit was issued. There's a gap in time in which there was no work to be done, and then issues came up with respect to what's called wrap insurance, and counsel referred to this, that there was concern, and there's an email about this wrap insurance. But this is after the issuance of any audits, and from that point forward there were never any audits issued. So the last audit report was December of 2007? That's for the year ending, December 31, 2007. That would have been sometime in the spring of 2008? Thereabouts, yeah. And as I recall, this issue about the wrap insurance that counsel was referencing occurred later in the year when Stonefield was looking to begin an audit for the next year. And how did the relationship end? I don't know whether I asked you that before, and I don't recall from the record. I believe. You handled this case in the district court, did you not? I did. I believe it ended in early 2009. I think it was before the Wall Street Journal article, and I think it was because Stonefield learned about this wrap insurance and other issues and decided not to proceed. I thought Stonefield resigned on April 29, 2009, after it learned about the SEC filing a complaint and the FBI had arrested Pang. If that's in the record, Your Honor, I am not disputing it. It's in ER 986-987. Okay. My recollection was before that time there had been some communication by Stonefield with respect to its willingness or unwillingness to proceed. But, again, I am not. I gave the caveat earlier. I did not have a clear memory on that. All right. Thank you, Your Honor. It's a lot to cover, but I'll try to be brief, Your Honor. I know I've already run over my time, but let me start. Well, the other side's run over as well. That is true. Justice Stroud, you are correct in terms of the timing of Stonefield's departure. Yeah, but I'm not a justice. There is no justice in the Ninth Circuit. Judge Stroud, you are correct. My apologies. You stepped right into that one. It was April 29, 2009, and that's at ER 985-987. If I could address first the comments. Talk about restitution. And related to that, the comments about when Mr. Mosher said this fraud was first happening. Mr. Mosher is a court-appointed receiver that stepped in here after the fact. He obviously wasn't a recipient witness at the time. They're on the scene. So all his testimony that's referenced by counsel is really speculation. But the better evidence of when the fraud began is evidence that Stonefield submitted with its moving papers, including the declaration of Mr. Kwan, which is found at ER 1207. The fraud began by GBEC. Yes, and PEM Group. The whole shooting match. Correct. Mr. Pang, in summary, says in his declaration that sometime in 2006, they realized that the life expectancies on these policies were, unfortunately for business purposes, going longer than they had planned, and therefore they weren't getting the revenue they anticipated. They were running out of money. And Mr. Pang then instructed Mr. Kwan and others to begin running this program as a Ponzi scheme. That was in 2006. Stonefield services continued through April of 2009. They signed off on agreed-upon procedure reports for the intertranche sales as late as May of 2008. Was Stonefield getting bad information from GBEC and the crooks? Yes. Well, yes and no, Your Honor, because Stonefield had enough to know, for example, that they did their own analysis determining, gee, these policies are being sold at excess of their value. Well, we have a case, Astiana v. Haines Celestial Group, and that says, quote, a claim for unjust enrichment is synonymous with restitution, and Astiana says the proper course is to sue on a quasi-contract theory, which is nice, except here we have a contract. So it seems to me that you'd have to sue on the contract for any restitution, if that's what you want to call it, and you're walking right into this. There's a release that I read earlier that says there's a release if there's any misrepresentation, and there was misrepresentation, so why doesn't the release just chop off your claim for unjust enrichment or restitution? I think there are tribal issues as to the enforceability of that prospective release in light of Stonefield's involvement in the wrongful conduct, Stonefield's aiding and abetting this wrongful conduct, Stonefield's knowledge of what was going on at the scene at GBEC. You can't, again, this wasn't brief, so I confess I can't cite the case to the court, but I think the law is pretty clear. You can't prospectively release tort liability. You can't say I'm going to go out and commit heinous torts, and by the way, you signed this release, and therefore I have no exposure for anything. Well, the other problem that we touched on earlier is that you were confronting a motion for summary judgment, and am I correct that you didn't defend the unjust enrichment claim? That's not correct, Your Honor. It wasn't briefed. Well, how did you defend it? You opposed the motion, but you've got to do more than say I opposed the motion. What did you come forward with to support your unjust enrichment claim? We submitted the declaration of Mr. Collins with respect to the payments that had been made to Stonefield. That's it? If I could back up, the briefing on the summary judgment, nowhere does it brief anywhere that the unjust enrichment claim fails for any reason. Admittedly, they asked for summary judgment, but there's nothing to respond to specifically on unjust enrichment that the claim should survive standing alone. There's nothing there. It wasn't briefed. Nothing where? In the moving papers. Well, in the moving papers that said we asked for summary judgment, doesn't that throw the onus on to you to come back and explain, support your theory with some kind of evidence? In hindsight, it would have been good for us to say, oh, separately we're going to say, and even if you dismiss the other claims, this should survive. We did not do that. But, again, there was nothing in the moving papers. Again, this is an appellate court. You didn't do that. You chose not to do that. So why aren't you stuck with your decision not to defend? Well, because it was not teed up in the moving papers, and because I think the court's rationale for the basis for dismissing the claim is simply wrong. Did you ask the district court for reconsideration on that point? We did not, Your Honor. Why? I mean, again, here we are in the appellate court, and you very well, if you've got a good point, and you think it was missed, you should have asked the district court, wait a timeout, you know. Why didn't you do that? Again, there were no new facts to support a reconsideration. Everything that was there was. . . Well, you could have done with the district court what you're now doing with us on appeal a number of years later. Well, again, Your Honor, our view was it had been. . . You had an opportunity to fix exactly what you're asking us to fix now, years later, right? You might not have won, but you had the opportunity at least to go forward and say, wait, timeout. We could have gone back to the district court and said, we don't like what you did on unjust enrichment, we think you should reverse it. We could have done that. Practice point. And on a de novo standard of review before this court, I would submit that the review is something that this court should undertake, and I think it was incorrect for the district court to dismiss that and the other claims. But if I might, if I could move quickly to the other claims, and particularly the aiding and abetting claim, because counsel indicated that the pleading on the aiding and abetting only teed up the audits. That is not correct, and the district court got it wrong here, and I think the record needs to be clear that the complaint in paragraph 52 at ER 1729 refers to. . . ER what, 17? ER 1729. Paragraph 52 of the first amended complaint says, and I'll read this, Stonefield aided and abetted by failing to conduct rigorous audits, and then I'll delete some of the material. In addition, Stonefield reviewed the insurance policies, paren assets, close paren, that were the subjects of the sale, reviewed the sale and purchase agreements between the tranches, and knew or should have known that the valuations of the policies were inaccurate, and goes on to talk about that. So that the complaint, even if we had to plead our evidence in the complaint, and I would submit we didn't, the complaint teed up separate grounds for the aiding and abetting claim, which was the direct involvement in the illicit intertranche sales, the signing off on these AUP reports, auditors calculating that overpayments are being made, that the overpayments are being made to fund the operations of the older entities. It was all there. The writing was on the wall. These are professional auditors. They had enough information to know time out. Something is up here. We shouldn't be giving our pen to this as a badge of legitimacy, and that's exactly what they did. The old misprison of a felony. Excuse me, I didn't hear that. Misprison of a felony. Simple case here on the case against Stonefield, both on the unjust enrichment claim and the aiding and abetting claims. They were perfectly happy to earn and collect their fees, notwithstanding the fact they had actual knowledge of these improprieties. They were even calculating and analyzing the improprieties. But what was Mr. Mosier's predecessors in interest doing when they got these flags from the auditors that they themselves had hired? You hire auditors to do your books, not to cook the books. And so they send you something in accord with accounting standards and say there's something wrong here. And what did Mosier's predecessors in interest, not tagging anything on Mr. Mosier, but he took over somebody else's messy. And I'm not suggesting that we can tie the causal connection on either the aiding and abetting claim or the negligence claim based on inaction by management. But these services, these things that Stonefield did, propped up this enterprise, gave it a badge of legitimacy, and allowed these people that did run the company to continue to bring in millions, tens of millions of dollars. And again, the declarations that Stonefield gave with its moving papers of Mr. Kwan and Mr. Abubakar showed they were taking this money in and at the same time spending tens of millions of dollars on looting. They were buying Learjets, Gulfstream jets, taking the company to China for a party, going to Disney World on a multi-day trip with all the company. They were basically robbing this as if it were a piggy bank, and they were getting the money in the door because Stonefield gave its badge of legitimacy. What's the measure of damages? What are you after? We are after the funds that were illicitly raised by the entities after Stonefield began to provide its services. And what are you after from Stonefield? On GVAC, it's laid out in the Collins Declaration, the amount of funds that were raised, and I don't have that directly. If I could have one moment, Your Honor? Yeah, I'm really interested in that. That's okay. The funds raised, the GVAC funds raised were $127,830,000, but of that sum, $51 million remains unpaid. That is what we're after. So you're after Stonefield. You're asking that they pay you $51 million. That's correct, Your Honor. You're asking for what? $51 million. $51 million. $51 million, yes, Your Honor. If Your Honors have any other questions, I'd be happy to answer them. I think I've run a bit over here on the time. You haven't asked. What are you asking us to do? I mean, do you want to amend your complaint, among other things, to figure out some way under our jurisprudence to pursue your unjust enrichment claim as restitution? Your Honor, to the extent the court finds that the unjust enrichment claim needs to be amended to survive, then yes, I am asking the court to reverse and remand and allow us to amend. And obviously on the other two claims, you're asking the court to reverse and remand for trial. Well, when you were before the district court, did you lay out a clear path that would lead to a ruling that your clients would obey? I think in our— Or did you just come in there and throw stuff up in the air? Your Honor, no, we did not just come in— You have to rely on the lawyers and their thinking and have them figure out the correct path to take. And I just get the sense that you never did that. Well, Your Honor, in this case, in light of the procedure— Did you ever hear of the equity funding reorganization? It rings a bell, but I can't tell you. Well, so go read it. That was one of my cases back in the 70s. You probably weren't born then. Unfortunately, Your Honor, I was. No, you know, up until that time, it was the largest corporate fraud in history. We had good lawyers, both sides, figured these things out. We were dealing with 98 separate corporate entities all over the world. Not one dime was honestly acquired. This is a smaller version of that, Your Honor, but— I don't know that it's a smaller version of that. I mean, I'm just talking about how it was handled, how it was presented. And district judges today have huge calendars. Cases are much more complex. All right? Thank you. Thank you very much, Your Honor.
judges: Stafford, Pregerson, Trott